UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

_____
                                                        :
DeAndre Tate,                                       :
                                                        :
                    Petitioner,                    :                 Docket Number
                                                        :                _____-cv-_____
              v.                                      :
                                                        :                   1:24-cv-3
Patricia Thompson, Superintendent,   :
State Correctional Institution at          :
Albion; and Erie County                    :
District Attorney,                             :
                                                        :
                    Respondents.                :
_____    :

**PETITION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. §2254**

Petitioner, DeAndre Tate, through counsel, petitions for a Writ of Habeas

Corpus and states the following in support.

## Contents

Introduction ............................................................................................ 2

Procedural History ................................................................................. 5

This Petition is Timely Filed .................................................................. 8

Exhaustion .............................................................................................. 9

Statement of the Case .......................................................................... 10

    A.    Pre-Trial Exchange About Petitioner's Defenses and Limitations on
        Those Defenses .................................................................... 10

    B.    The Defense Trial Presentation ........................................... 12

C.      The Mental Health Records Not Presented at Trial ........................... 15
D.      PCRA Hearing -- Support for the Trial Defense that was Ineffectively Not Presented to the Jury ................................................................... 22
E.      PCRA Post-Hearing Proceedings in the Trial Court.......................... 29
F.      PCRA Appeal.................................................................................... 30

Ground for Relief................................................................................. 31

Request for Relief................................................................................. 33

## Introduction

Petitioner is a severely mentally ill man.  His mental health records show a history of paranoid delusions and command hallucinations.  He saw and communicated with dead people.  At times he did not eat or sleep for long periods. Even after his discharge from the mental health clinic he was in after his illness was to some degree stabilized, he was awarded only an overall GAF Score of 45, which, as explained below, means that even after stabilizing treatment, he was still significantly impaired.

Petitioner has a documented history of multiple suicide attempts that pre-dated the offense.

Petitioner was charged with attempt to murder two police officers and related offenses.  Fortunately, neither officer suffered physical injury.  Trial counsel presented a defense that Petitioner did not intend to kill the police officers when he shot at them, but instead, was attempting "suicide by cop." This defense was supported by Petitioner's statements to the police to that effect, and by his trial

testimony. His trial lawyer knew of Petitioner's mental health history and of his history of suicide attempts. Counsel had in his file the mental health records that reveal this history, including the prior suicide attempts. However, counsel never engaged a mental health professional to support his defense of "suicide by cop" – no intent to kill.

Without such an expert, Petitioner's presentation of his defense was supported only by his testimony. Without an expert, he was not permitted to introduce his mental health records, that confirmed his diagnoses of major mental illness, medication history and history of suicide attempts. Contrariwise, an expert could have, at a minimum, corroborated Petitioner's testimony about that history as it is prominently noted in the records, and educate the jury on how that history of impairments contributed to his offense conduct, that counsel argued was essentially a suicide attempt. Instead, the only support for this defense was Petitioner's testimony, with court-imposed limitations on how much of this defense could be presented. These limits are discussed below, but are summarized by the trial court's admonition to trial defense counsel that Petitioner, during his testimony, could not "be his own expert."

Counsel's failure to have engaged a mental health professional also resulted in the presentation to the jury of a false image of Petitioner. After a lapse of almost two years, Petitioner restarted treatment during the pre-trial period of his case.

Petitioner received psychiatric medications that unquestionably impacted his presentation to and appearance before the jury. A medication list contained in the mental health records dated May 28, 2018 -- three weeks before trial -- shows that Mr. Tate was heavily medicated with a regimen of psychiatric medications. Thus, when he testified, he appeared mentally healthy or at least not psychotic. That "normal" presentation was at odds with the picture he attempted to convey to the jury of how his mental health impairments motivated him on the night of the offense to commit "suicide by cop" Counsel could have used the same expert to testify as to why the symptoms described in his testimony were being held at bay through the powerful medications that he was taking.

Undersigned counsel engaged such a mental health expert for the post-conviction proceedings. She evaluated Petitioner, and reviewed his mental health records. She then testified at the PCRA hearing about Petitioner's multiple pathologies, and how she could have educated the jury about his illness, his history of suicide attempts and how his actions on the night of the offenses were consistent with that history. In short, the expert explained that this shooting in the direction of the police, was just another in a series of suicide attempts, *i.e.* suicide by cop.

Notably, trial counsel watched the testimony of the post-conviction mental health expert. Having done so, he confessed his ineffectiveness during his post-

conviction testimony. He said that he should have engaged a mental health expert, and had no tactical or strategic decision for not doing so.

## Procedural History

DeAndre Tate was arrested on January 27, 2017 following an incident in which, after a five day "binge," during which he did not sleep and used drugs and alcohol, he failed to stop when the police tried to pull over the car he was driving. When he finally stopped, he alighted the car and fired shots at two law enforcement officers. He was wounded in the exchange and taken into custody. The officers suffered no physical injury.

Petitioner was charged under docket number CP-25-CR-1050-2017 (CCP Erie Co.) with a dozen counts, as follows:

1.  Violation of 18 Pa.C.S. §2707.1 (aggravated assault);
2.  Violation of 18 Pa.C.S. §2707.1 (aggravated assault);
3.  Violation of 18 Pa.C.S. §901 & 2507(A) (attempt to commit murder of a law enforcement officer);
4.  Violation of 18 Pa.C.S. §901 & 2507(A) (attempt to commit murder of a law enforcement officer);
5.  Violation of 18 Pa.C.S. §3925(A) (possession of stolen property);
6.  Violation of 18 Pa.C.S. §901 (criminal mischief);
7.  Violation of 18 Pa.C.S. §6106(a)(1) (firearm without a license);
8.  Violation of 18 Pa.C.S. §907(b) (possession of an instrument of crime);
9.  Violation of 18 Pa.C.S. §2705 (recklessly endangering another person);
10. Violation of 18 Pa.C.S. §2705 (recklessly endangering another person);

11.   Violation of 75 P.S. §3733 (fleeing or eluding a police officer); and,

12.   Violation of 18 Pa.C.S. §6105(c)(6)(failing to relinquish a firearm while under a protection of abuse order).

He was tried by a jury in the Court of Common Pleas, before the Honorable John J. Mead on the above counts on June 19 through 21, 2018. He was found guilty of counts 1-4; and 7-11.[1]

The Court ordered a pre-sentence report. It recounted, among other things, Mr. Tate's mental health history, but did not reference the extant mental health records showing years of mental illness and treatment:

> The defendant reported that he has been receiving outpatient mental health treatment at Stairways since 2012. He reported that he has previously been diagnosed with bipolar-manic depression, post-traumatic stress disorder and anxiety. The defendant also reported that he hears voices and sees people, however, he did not indicate any diagnosis for this. The defendant also reported that he has tried to commit suicide several times in the past.

*Pre-Sentence Investigation*, unnumbered page 5 (Section IV Treatment Information).

Sentencing occurred on August 6, 2018. Mr. Tate was sentenced to mandatory sentences of 20-40 on counts 1 and 2, to run concurrently. NT 8/6/2018, 18-19. No sentence was imposed on counts 3 and 4, as they merged. *Id.*, 19. On count 7, the Court sentenced him to 42-48 months (3.5 to 7 years), consecutive to

---

[1] Counts 5 and 6 were *nolle prosed* and count 12 was severed and then *nolle prosed*.

count 1. He was sentenced on Count 8 to 12-24 months, consecutive to the other sentences. Counts 9 and 10 merged and no sentence was imposed. *Id.* The sentence on count 11 was 6 to 12 months, consecutive to count 1. *Id.* The total cumulative sentence imposed was 25-50. *Id.*, 20.

Post sentence motions and amended motions were filed on August 16 and 20, 2018. The motions were denied on September 14, 2018.

A direct appeal was filed and denied. *Commonwealth v. Tate*, 1413 WDA 2018 (Pa.Super. Oct. 7, 2019).[2] Leave to appeal was not sought.

Petitioner was represented through direct appeal by Attorney Eugene Placidi. The Commonwealth was represented by ADA Paul Sellers.

Undersigned counsel was retained by Petitioner for PCRA proceedings. He filed a timely, counseled PCRA Petition on November 2, 2020. Due to delays caused by the COVID19 Pandemic, an evidentiary hearing was not conducted until March 28, 2022. Following the hearing, the Court received post-hearing briefs. On August 12, 2022 the trial court issued an order and an accompanying Opinion denying the Petition.

---

[2] On direct appeal, Petitioner raised two issues: that the verdict was against the weight of the evidence and that the evidence was legally insufficient to sustain the verdicts of guilt on the two counts of attempt to commit murder of a law enforcement officer.

A timely Notice of Appeal was filed, followed on September 13, 2022 by a *Concise Statement of Errors Complained of on Appeal*. On September 14, 2022 the PCRA court issued a second Memorandum addressing the *Concise Statement*.

On appeal of the denial of the PCRA Petition, Mr. Tate, still represented by the undersigned, raised the issues presented to the trial court and herein. The Superior Court affirmed the denial of PCRA relief. *Commonwealth v. Tate*, 958 WDA 2022 (PA.Super. Sept. 28, 2023).

Petitioner through counsel filed a Petition for Leave to Appeal to the Pennsylvania Supreme Court. *Commonwealth v. Tate*, 268 WAL 2023 (Pa. Oct. 30, 2023). As of the date of this filing, that Petition is **still pending**.[3]

### This Petition is Timely Filed

28 U.S.C. § 2244(d)(1) imposes a one-year statute of limitations on filing of a petition for habeas corpus. That one-year period "shall run for the latest of … the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Direct review concluded 30-days following the decision in *Commonwealth v. Tate*, 1413 WDA 2018 (Pa.Super. Oct.

---

[3] The instant petition for habeas corpus is filed **before** a decision on the leave petition is issued because, as shown in the next section, Petitioner has only a three days remaining on the AEDPA limitations period. Counsel will file a motion to hold these proceedings in abeyance until the Pennsylvania Supreme Court rules on the leave petition.

7, 2019), as there was no leave petition filed. Thus, Petitioner's AEDPA limitations period started to run on November 6, 2019.

28 U.S.C. § 2244(d)(2) tolls the limitation period while a properly filed state post-conviction petition (*i.e.*, PCRA) is pending. Petitioner properly filed a PCRA petition on October 30, 2020 when, because Erie County did not utilize PAC-File at that time, counsel placed the same in the United States Mail, for overnight delivery, addressed to the state court clerk. The Clerk of Court docketed the Petition on November 2, 2020. Thus, the AEDPA limitations period has remained tolled during the pendency of the PCRA proceedings and will recommence once the leave petition is either denied, or, if granted, once there is a decision on the appeal.

As noted, because Petitioner has only a few days remaining on the limitations period, he files this Petition before a decision on the leave petition is issued.

## Exhaustion

The sole ground presented in this Petition alleges that trial counsel was ineffective for failing to engage a mental health expert at trial. That ground was squarely presented to the state courts in PCRA and on PCRA appeal. It is thus fully exhausted and Petitioner meets the exhaustion requirement of 28 U.S.C. §2254 (b)(1)(A).

## Statement of the Case

**A.    Pre-Trial Exchange About Petitioner's Defenses and Limitations on Those Defenses**

Just before opening statements the prosecution asked to see the Court in order to raise its concerns about counsel's opening statement to the jury. NT 6/19/2018, 3. The prosecutor's concerns were based on the content of slides that counsel wanted to offer that "detail mental health symptoms … [and] medication that he's indicating he's been prescribed … as well as prior illegal drugs which he has used."  *Id.*

The prosecutor objected to the slides related to medication and illegal drug use, correctly pointing out that "voluntary intoxication" is not an available defense to any charge other than first-degree murder.[4] And, because there was no expert witness noticed by the defense, there would be no expert testimony related to the impact of the drugs and medications on his behavior.  *Id.*

Counsel responded that "**expert testimony isn't relevant**" to the defense which counsel characterized as "what his intent was, his state of mind was on the night in question." *Id.*, 4.  Counsel responded to the court's question, that he did not have an expert witness for this case. *Id.*, and continued:

> what we intend to show with this is that he had past diagnoses of mental health issues that are **undisputed**. He was not being treated for his mental health issues. He was not taking the medications as he needed to take. He was self-medicating with alcohol and drugs.   And on the night in question he, in fact, attempted to commit suicide by cop -- suicide by

---

[4] The Court agreed (NT 6/19/2018, 6; R. 42-a), and counsel did not argue to the contrary.

police officer. Therefore, it's up to the jury to determine whether or not when he fired the gun on the night in question, he had the specific intent to shoot either officer Allison, or officer Wilson, or the specific intent to cause bodily injury to either of those two officers.

**Expert testimony would be irrelevant to this**, Your Honor, but I think my client has the right to testify as to what his past diagnoses were. He obviously has a right to testify that he wasn't taking medication at the time. He has the right to testify as to what he was doing at the time with street drugs and with alcohol. It's not a question of diminished capacity. It's a question of -- what his state of mind was at the time in question is for the jury to determine whether or not they believe that and whether or not they believe that he had the specific intent to shoot at -- to kill these officers and specific intent to cause bodily injury.

*Id.*, 4-5.

The prosecutor argued that without expert testimony to explain the significance of Mr. Tate's mental health history and medications "we are asking lay jurors to consider that he was previously diagnosed…" with a variety of mental illnesses, and the testimony would be "irrelevant" without an expert opinion. *Id.*, 7. Counsel retorted, correctly, that Petitioner had a right to testify about his intent without an expert "he has a right to testify as to what his state of mind is at the time." *Id.* The Court agreed that "intent is an issue." *Id.* However, other than saying that he was not using an expert, counsel never explained his position as to why an expert opinion would be "irrelevant."

This discussion ended with the Court directing counsel not to use his slides in the opening, but not precluding counsel from discussing Mr. Tate's mental health history and some of his symptomatology. *Id.*, 10-11. The Court agreed that such

discussion would be proper. *Id.*  However, even though the Court permitted counsel to open on Petitioner's lack of intent, it pointed out that an expert would be needed to relate that history and symptomatology to form an intent.  The prosecutor agreed: "if we had an expert essentially come in here and say that he's … to form the intent. He couldn't tell right from wrong." *Id.*, 11. *See also id.*, 18 (court agreeing that Petitioner could testify to his state of mind, but indicating it would sustain a prosecution objection if Petitioner tried to draw a connection between his mental health history and diagnoses and his actions on the night of the offense: "**he can't be his own expert and say ... because I had PTSD that's why I did this**...").

### B.    The Defense Trial Presentation

Aside from Mr. Tate, the defense called one witness, Jacob Rouch. NT 6/20/2018, 57. Mr. Rouch was a City of Erie Police Officer on the day of the incident.  He responded to the scene after Mr. Tate was shot and testified that all that Mr. Tate "uttered … several times was suicide by cop." *Id.*, 61.

Petitioner's direct testimony took up a mere 15 pages of transcript. NT 6/20/2018, 64-79.  He provided some pedigree information, *id.*, 64-65; and a brief employment history. *Id.*, 65-66. He described his mental health, "all my life I have been struggling with mental health.  I would say like anxiety, depression, PTSD." He first noticed these "issues" in the first or second grade, but they became "more

severe" at age 13.  *Id.*, 66. He was first provided "help" for these problems at age 21
or 22 when he "resided"[5] in Ohio. *Id.*, 66-67.

He testified that when he returned to Erie from Ohio in 2012, he continued his
treatment at Stairways Behavioral Health. He was treated there from 2012 until
"2015 or 2016." He "graduated" from that program "so they required me to go across
the street, in which I did, and I had set up appointments … eventually I got lost in
the system." *Id.*, 67. He took medications while being treated, but stopped the
medications when he stopped treatment.  *Id.*, 67-68.  He then "self-medicated" with
various street drugs and various pills and alcohol." *Id.* 68.

Petitioner recounted his history of suicide attempts.  In total, he testified to
having made three to six such attempts, including two weeks prior to the shooting
incident when he tried to overdose on drugs and alcohol. These attempts also
included hanging and "cutting." *Id.*, 68-69.

Likely because counsel believed that this history was "undisputed" (NT
6/19/2018, 4-5; and because of the court's ruling that he could not offer supporting
records without an expert, counsel offered no documentary support for Petitioner's
recounting of his history. And, he presented no mental health expert to, at a

---

[5] Petitioner was in prison in Ohio on a drug charge during a portion of this time and received some
mental health attention from the prison authorities.

minimum, introduce and explain how the records corroborated Petitioner's recounting of his history.

Petitioner next testified about the day before and the day of the shooting, January 26 and 27, 2017.  He described being on a "five-day binge" during which he was using drugs and alcohol, not eating and not sleeping.  *Id.*, 69. He was "consumed with using drugs and alcohol, to try to cope with my mental health issues." *Id.* He wound up in a bar that night along with his friend. They took her car to the bar. He was using drugs before and after the bar, but he did not specify what he was drinking or the drugs he was using. *Id.*, 70-71.

They left the bar in her car with Petitioner driving. He described the route taken by the car and how the police began to follow and then pursue the car that he was driving.  He described the pursuit.  *Id.*, 71-75. The pursuit ended at the Soldiers and Sailors Home. He claimed to have "panicked," "had suicidal thoughts," "grabbed the firearm" that was in the car and that he believed belonged to his friend. He said he hoped that the police would "see it" and "return fire" so that he "would be able to commit suicide by cop." He further claimed that he had no "intent to shoot the police."  *Id.*, 75-76; R. 68-69-a. He began to run and fired the weapon in the air because "I didn't want to hurt" anybody.  *Id.*, 76; R. 69-a. He described how he being shot and his arrest, and how he told the police to "let me die … I want to die." *Id.*, 77-78.

When he attempted toward the close of his testimony to explain his illness ("I'm biopolar ..."), the prosecutor objected, and the Court sustained the objection. *Id.*, 78. He said he was currently being medicated, but there was no mention of the type of medication. *Id.*

## C.    The Mental Health Records Not Presented at Trial

Trial counsel's file had in it almost 200 pages of records on Mr. Tate's mental health treatment starting in late 2013 and continuing through trial. These records at a minimum provide significant corroboration of the "suicide by cop" defense presented at trial. Because trial counsel did not engage an expert witness, the jury never saw them or heard about them

Mr. Tate first appeared at Stairways Behavioral Health, 2911 State Street in Erie on December 3, 2013. The entries from this first visit include the following:

> De'Andre reported **command hallucinations** telling him to **hurt himself and others**. He stated that the last time this happened was a couple of weeks ago.

> De'Andre reported a history of punching walls and cutting.

> De'Andre reported HI [homicidal ideation] that occurred a few weeks ago.

> De'Andre reported visual hallucinations that occurred a few months ago of people following him or trying to kill him.

He attended a session on January 31, 2014.[6] On February 21, 2014 he was seen by a Dr. Craig Rush, DO.[7] Dr. Rush made the following treatment recommendations:

> We discussed treatment options and a differential diagnosis of MOD with PF and [Major Depressive Disorder with psychotic features] Substance-Induced Mood d/o. He does not meet criteria of mania/hypomania for Bipolar disorder, but it cannot be completely ruled out. He is agreeable to start medications and will start Prozac[8] 20mg daily for depression and Thorazine 50mg[9] HS for hallucinations, sleep, and anxiety.

He reported to the clinic next on March 5, 2014 "The voices are the same." On March 13, 2014 he was seen "Anxiety and depression remain unchanged." The evaluator also noted that his speech was "outside normal limits"; his thought process "outside normal limits, underproductive internally preoccupied"; his

---

[6] "He stated his anxiety is caused by his conscious (little voice in his head)."

[7] The records also show the following: "Reports eating once a day. 'I am depressed.'" "Reports internal stimuli, stating he **hears voices**… Reports paranoia that the voices are telling him to '**Protect himself, that people are after him**.' Is currently not take medication at this time." "He reports auditory hallucinations of one voice warning him about others and occasionally commanding him to harm himself or others." "Given his history and command hallucinations, his risk of him to self or others appears high." "There appear to be non-fixed delusions or paranoia. He is currently experiencing auditory hallucinations."

[8] Prozac is used to treat depression, among other things. *See* https://www.webmd.com/drugs/2/drug-6997/prozac-oral/details, visited January 2, 2024.

[9] Thorazine is "used to treat certain mental/mood disorder (such as schizophrenia, psychotic disorders, manic phase of biopolar disorder." *See* https://www.webmd.com/drugs/2/drug-9543/thorazine-oral/details, visited January 2, 2024.

associations were "loose"; "auditory hallucinations" and judgement and insight "outside normal limits, limited."

On March 27, 2014 the evaluator noted that "His affect was flat and eye contact was poor. His speech is minimal and guarded and he appeared internally preoccupied throughout the assessment. He admitted to some paranoia and is experiencing auditory hallucinations.

On April 4, 2014 he told the evaluator "I'm still doing bad. Nothing has changed." The evaluator noted "He is taking his medication daily as directed but feels it is not working." Mood was noted as "depressed and affect blunted." Thorazine was discontinued and was replaced by Zyprexa 10 mg.[10]

He was seen on April 17, 2014;[11] May 7, 2014;[12] and May 15, 2014.[13]

Dr. Rush saw him again on June 19, 2014. He increased his dose of Zyprexa to 20 mg and continued him on Prozac:

---

[10] Zyprexa "is used to treat certain mental/mood conditions (such as schizophrenia, bipolar disorder). It may also be used in combination with other medication to treat depression. This medication can help to decrease hallucinations and help you to think more clearly and positively about yourself, feel less agitated, and take a more active part in everyday life." *See* https://www.webmd.com/drugs/2/drug-1699/zyprexa-oral/details, visited January 2, 2024.

[11] "Feels his depression is not changed much." "Voices continue, will increase Zyprexa to 15 mg and continue Prozac.

[12] "De'Andre stated that he is able to control his anger but sometimes, 'it just comes out.' He shared that people make him angry. He reported that he has been getting more sleep lately, but also calling off work due to medical reasons and depression."

[13] This visit showed improvement: his mental status examination was all within normal limits.

Mr. Tate is here today for an office visit with Dr. Rush. He reports he is doing alright. He states he is taking his medication as prescribed. He denies any SI/HI. He states he is hearing voices every day, if he is in a good mood, he hears good things if in a bad mood he hears bad things. He denies being depressed, he denies hallucinations or delusions.

He returned to see Dr. Rush again on July 16, 2014. The report notes that he was compliant with his medications and that he feels "better." Dr. Rush noted no reports of depression, mood swings, mania, voices or homicidal or suicidal ideation, "mood is euthymic and affect congruent, he appears alert and clear-minded today with good focus."

When he was seen next of August 14, 2014, he continued to make good progress. He reported his anxiety was down to a "3" on a scale of 1-10 with 10 being the most anxious. He reported that the "medications were working well."

On his next appointment of September 16, 2014, the evaluator noted that he had been recently diagnosed with Priapism.[14] The medications prescribed for that caused him to not take his psychiatric medications. Notably, the report recommended that he "discontinue his medications and continue to monitor. Re-evaluate need for meds if function decreases."

---

[14] "Priapism is the erection of the penis for prolonged periods. The persistent erection continues hours beyond or isn't caused by sexual stimulation. Priapism is usually painful." https://www.mayoclinic.org/diseases-conditions/priapism/symptoms-causes/syc-20352005, visited, January 2, 2024.

His next appointment of December 4, 2014 -- months since he stopped taking his medications -- showed a marked increase in his mental health symptoms due. These symptoms included voices telling "me to hurt someone or myself":

> De'Andre is seen today for an office visit. "I have good and bad days. I have like 3 or 4 good days and then 3 or 4 bad days. I still hear voices. I was taking medication, but nothing ever seemed to get better, so I stopped. I've been *off* of medication for 2-3 months. At first things seemed the same but now it seems like they are getting worse. Sometimes the voices tell me to hurt someone or myself, so I just try to be also if that happens. [sic]" He reports initially he had difficulty eating on the medication but that did resolve. He denies any other adverse effects.

> Patient reports he is now off meds for 3 months and his s/sx [signs/symptoms] have returned and worsened. He reports auditory hallucinations with occasional commands to harm others. He reports paranoia and agoraphobia. He reports nightmares. He reports confusion and making connections between events that are unrelated. He reports occasional depression and other times agitation. He endorses insomnia, anorexia [lack of appetite], anergia [lack of energy], amotivaiton. He denies SI/HI. He has a flat affect and … some disorganized thinking.

His mental status was outside of normal limits in multiple respects, including the presence of voices and with poor judgment and insight.  Dr. Rush recommended starting on Seroquel XR 150 mg,[15] and Mr. Tate agreed to do so.

---

[15] "This medication is used to treat certain mental/mood conditions (such as schizophrenia, bipolar disorder, sudden episodes of mania or depression associated with bipolar disorder … It works by helping to restore the balance of certain natural substances (neurotransmitters) in the brain.  This medication can decrease hallucinations and improve your concentration. It helps you to think more clearly and positively about yourself, feel less nervous, and take a more active part in everyday life. It may also improve your mood, sleep, appetite, and energy level. Quetiapine can help prevent severe mood swings or decrease how often mood swings occur." https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details, visited, January 2, 2023.

He was seen by a nurse on December 18, 2014 and reported that he continues to "experience hearing voices that sometimes tell him to hurt himself or others. He also reports have conversations with him [sic] grandfather, who has passed away and other loved ones that have passed on."

Dr. Rush saw Mr. Tate next on January 15, 2015 and noted that although he was "stabilizing on Seroquel" he is "still bothered by auditory hallucinations **daily**." Dr. Rush recommended "titrating" Seroquel to 300 mg (*i.e.* slowing increasing the dose).

He was seen in the clinic on January 29, 2015 by a nurse who noted "He reports he continues to have daily auditory hallucinations. He reports that he has not started taking the Seroquel 300 mg dose yet because his insurance doesn't get turned back on until 2/1/15…"

His appointments continued on February 3, 2015;[16] February 12, 2015. He was seen by a different doctor, Jessica Morel DO/MD on February 24, 2015 who noted, among other things:

> He thinks his mood swings started in 1st grade. He didn't receive any treatment until the age of 21 while in jail … De'Andre states his nightmares started as a teenager after being held up, robbed and pistol whipped. They became worse in prison after his roommate cuts his wrists and there was blood all over the cell … De'Andre has suicidal thoughts sometimes. He has planned it out before and attempted when he was younger. He did have plans a few months ago put pursues

---

[16] "He shared that the voices he hears also can still get to him"; "De'Andre reports doing well with his sobriety over the last year."

> supports to talk to instead [sic].   He also has homicidal
> thoughts…De'Andre hears voices all day every day.  He hears one male
> voice, it is inside his head, sometimes he tells him things that he should
> be paranoid but often times it is encouraging things. He also sees
> people, it is usually his grandfather but sometimes strangers.  He sees
> these people a couple of times a week, at night, when he is alone.

Dr. Morel order that he discontinue Seroquel due to his priapism and he started on

Latuda for his bipolar depression and Remeron "for his poor sleep."

On his next visit on March 6, 2015, the new medications appeared to have a

positive impact: "DeAndre states he is doing well and doesn't have any mental health

concerns today.  He reports he is taking his medications as prescribed…He denies

any SI/HI… the voices are not as persistent now that he is taking his medications."

On June 30, 2015 De'Andre Tate was discharged from the mental health

treatment that he had been undergoing for approximately the prior year and one-half.

This is the last entry before the offense.  His discharge diagnosis included, on Axis

I, Bipolar disorder and PTSD and a GAF Score of 45.[17]

Because trial counsel never engaged a mental health expert, these records

were never presented to the jury. Thus, Petitioner lost the opportunity to demonstrate

---

[17] A GAF Score "is used to rate how serious a mental illness may be. It measures how much a person's symptoms affect his or her day-to-day life on a scale of 0 to 100. It's designed to help mental health providers understand how well the person can do everyday activities. The score can help figure out what level of care someone may need and how well certain treatments might work."  A score of 45 falls in the range of "serious symptoms (*e.g.* suicidal ideation, severe obsessional rituals … or any serious impairment in social, occupations or school functioning.")
*see* https://www.webmd.com/mental-health/gaf-scale-facts, visited January 2, 2024.

to the jury that his mental health history was real, long-term and debilitating. He lost the chance to show that even after being stabilized, he ended treatment with a GAF of 45, indicating that he was severely impaired. Most important, he lost the opportunity to prove through these objective records that pre-dated the offense by years, that he had a history of suicide attempts and suicidal ideation.

### D.    PCRA Hearing -- Support for the Trial Defense that was Ineffectively Not Presented to the Jury

**Dr. Gilllian Blair** was accepted as an expert in clinical and forensic psychology. NT 3/28/2022, 8. She identified a referral letter sent by undersigned counsel to her asking for her opinion on four subjects related to Petitioner, as reflected on PCRA Exhibit 2, *id.*, 8-9. The subjects were:

1. Was there a colorable claim that at the time of the offenses, Mr. Tate was not guilty by reason of insanity (NGRI);[18]

2. Would a mental health expert been able to support the defense that was presented: that Mr. Tate was severely depressed and suicidal at the time of the shooting incident, and sought to commit "suicide by cop," and did not have an intent to kill. As it was, his lawyer instead presented this defense primarily through the testimony of Mr. Tate. He offered no documentary support of his client's testimony regarding his history, although the records could have been presented through an expert witness.

3. *Riggins v. Nevada*, 504 U.S. 127 (1992) identified the problems that can arise when a mentally ill defendant is highly medicated for trial (thus appearing "normal" to a jury), while at the same

---

[18] Counsel made clear, as did Dr. Blair, that she could not opine on the defense of not guilty by reason of insanity. NT 3/28/2022, 3-4 (counsel's opening statement to the Court); *Id.*, 27 (Dr. Blair's testimony). The question of NGRI was thus abandoned during the PCRA Hearing.

time presenting a mental health defense. In Mr. Tate's case, he was not medicated for years preceding the offense, but was medicated for many months before trial. Therefore, the jury saw what appeared to be a mentally healthy individual and was asked to judge whether that normal looking person had the mental health deficits about which he testified. Would an expert like yourself been able to contextualize his trial appearance in view of his history?

4.    Would a mental health expert like yourself been able to provide the Court with assistance in sentencing?

In order to respond to these referral questions, Dr. Blair reviewed records provided by counsel, including those from Stairways Behavioral Mental Health Program (PCRA Exhibit P-4); the University of Pittsburgh Medical Center; the PCRA petition; portions of the trial transcript; and records from the Department of Corrections (DOC) (PCRA Exhibit P-5), NT 3/28/2022, 11-12. She also conducted three, two-hour clinical interviews with Petitioner (*Id.*, 9-10) and she interviewed Petitioner's mother, Darlene Jones, on the telephone, for over an hour. *Id.*,  12, 41.

Based on this information and interviews, she issued her report, PCRA Exhibit P-3, NT 3/28/2022, 10.

Based on her overall evaluation she came to understand that Mr. Tate has been depressed for virtually his entire life, beginning at age five. She described a "very difficult and troubling childhood," that included clinically significant domestic violence, substance abuse and "a lot of chaos in the family." *Id.*, 12-14. He was in special education classes and needed extra support for a language disorder. He

"struggled" in school. He "never really understood what was going on in school." He was a "loner;" had no friends; "didn't seem to fit in;" and "felt marginalized." Mr. Tate never knew his father. *Id.*, 13. Although he had no history of physical aggression or fighting in school, he was suspended for acting out, being verbally disrespectful, and not completing his work. *Id.*

Mr. Tate's mother reported being in denial about his need for mental health interventions. Although she found evidence of "significant drug use" when Mr. Tate was an adolescent, she did nothing to secure treatment for him. *Id.*, 14. She told Dr. Blair:

> [S]he didn't want him to be labeled; that she thought that that would be problematic for him. Umm, she recognizes that -- or recognizes now ... and wishes that she had intervened and had done something when it was clear that, as a child and as a young adolescent, that he was struggling ... and, you know ... she feels that as her failure as a parent ... but, you know, she can't change that. So, I think she knew that he was suffering. I think she, umm, at the time believed that she was doing the best possible thing that she could. For example, when he dropped out of community college and she said, you know, you need to live by my rules or you go elsewhere. I think that she was hoping that that tough love approach would be sufficient ... so even though there were all of these red flags, she recognizes now that she failed to step in and intervene. So, I don't think she at the time really knew the extent of his mental health problems.

NT 3/28/2022, 26-27.

Although he enrolled in community college after high school, he dropped out after only a month or two. Because he would not live under his mother's rules at that time, he left the home and was "pretty much homeless." To survive, he would sneak

into his mother's home to sleep in a closet and to get food. Despite all of these difficulties, Petitioner had no juvenile arrests. *Id.*, 15.

Mr. Tate had three drug-related adult arrests, including one in Ohio with a resultant five-year sentence in 2006. While incarcerated in Ohio, he was first formally identified as having mental health issues and was on psychotropic medications. He then returned to Pennsylvania and initially did not have any mental health treatment. *Id.*, 15-16.

Mr. Tate was referred to Gateway Behavioral Health by his parole officer when he returned to Pennsylvania and was admitted. He was convicted of a DUI in 2013. He then received drug and alcohol treatment from Gateway, and was referred by them to Stairways. *Id.*, 17-18; R. 112-113-a. He attended Stairways from 2013 to 2015 for mental health treatment. Once his parole ended, he was supposed to continue that treatment but the transfer "fell through the cracks." *Id.*, 18.[19]

At the time that his treatment ended in 2015, he had been diagnosed with bi-polar disorder, episodes of paranoia, and depression. He had command

---

[19] Dr. Blair explained "how easy it is for individuals to fall through the cracks" of such programs:

> And I think it's important to recognize that these agencies have a huge turnover in staff. They are  underfunded; they are overworked. They have a huge number of patients that they have to provide services to. So, I'm not laying blame at Stairways. I know how these organizations work. And I know how difficult it is. And I know how easy it is for individuals to fall through the cracks.

*Id.*, 19.

hallucinations and was treated with antipsychotic medications when the program ceased. *Id.*, 19-21. Mr. Tate continues to have "periods when he hears voices." *Id.*, 22. Such hallucinations represent a "break with reality ... he's hearing voices that aren't there, or he's seeing things that aren't there." *Id.*, 22-23. The "predominant clinical impression" from the DOC in January 2022 was that he suffers from PTSD and depression and was prescribed Sinequan, an antidepressant. *Id.*, 22.

The Stairways records show that he had episodes of suicidality. He reported to Dr. Blair four suicide attempts during his life. He endorsed in the Stairways records three to five such attempts including cutting himself and once attempting to hang himself. *Id.*, 24-25. Thus, the Stairways record -- created long before the shooting incident for which he was tried, and therefore before the existence of any motive to fabricate -- corroborated his history of suicide attempts and ideation. *Id.*, 25, 26 (Dr. Blair agreeing that: "the Stairways records ... document, at a minimum, his self-report to the providers before the offense that he had a history of suicide attempts")

After reviewing Mr. Tate's troubled history, Dr. Blair responded to the four referral questions posed by counsel. As noted, she did not endorse the availability of an NGRI defense and that claim was not forwarded at the hearing. *Id.*, 27.

With respect to the **second referral question**, Dr. Blair understood the trial defense to be that Mr. Tate did not have an intent to kill because he was attempting,

yet again, to commit suicide, this time by shooting at the police and hoping to be killed by their return fire. *Id.*, 29, 44. She noted that the trial record contained **no corroboration** of this defense that was presented entirely through Mr. Tate's testimony. *Id.*, 29. Had she, or a similar expert, been engaged by trial counsel, she could have provided such corroboration:

> I think that what would have been important for the jury to know is that, there were at least three prior suicide attempts; that there was a significant history of mental health treatment while he was incarcerated in Ohio; and then after his release from Ohio, his treatment at Stairways from 2013 through 2015; plus his two inpatient treatments for a severe substance use disorder.

> I think that that information ... should have been presented to the jury so that they could understand the context and the mental health history of Mr. Tate prior to January the 27th, 2017.

*Id.*, 30. She would have been able to explain to the jury what was in the Stairways records, including the presence of "major mental illness;" auditory and visual hallucinations, and suicidality. *Id.*, 30-31.

With respect to the **third referral question**, she reviewed the powerful antipsychotic medications that were administered to Mr. Tate after the offense and at the time of trial. Those medications "would have made him very calm ... very sleepy." *Id.*, 32. His trial testimony "appeared to be in touch with reality ... he appeared very calm ... thoughtful ... responsive."

He also appeared to be calm, coherent, with clear and rational thought processes when Dr. Blair interviewed him. *Id.*, 46-48. Dr. Blair attributed that to the fact that he was then being properly medicated by the DOC. *Id.*, 51.

Regarding the **fourth referral question**, Dr. Blair opined that she could have been helpful in sentencing by presenting all of the above information to the trial court. Id., 33.

**Attorney Gene P. Placidi** testified that he was trial counsel in this matter through sentencing. *Id.*, 54. His trial defense was that Mr. Tate never meant to hurt or kill any police, but rather he was "intending to hurt himself as by suicide by police officer." *Id.*, 54; R. 149-a.

Prior to testifying, he reviewed the PCRA petition filed in this matter (*Id.*, 58) and he was present for Dr. Blair's testimony (*Id.*, 59). Based on what he learned from the Petition and from listening to Dr. Blair, he testified that "**at the time of trial**, **it came abundantly clear to me that I should have asked an expert to review these matters**." Such an expert would have provided "relevant testimony to buttress the mental health issues that we were arguing, in fact, to the jury consistently with our defense. I ... probably should have done that. I'm not denying that." *Id.*, 58. He went on to note that he could not argue diminished capacity, "any type of impairment" including "voluntary intoxication" that is not "a defense to an intent charge." However, "**and it hit me at the time of trial, to be blunt about it**, that I should

have probably consulted an expert to offer what testimony that expert **could have offered in support of the mental  health issues suffered by Mr. Tate**. **And that's the truth. That's how I felt from the trial ...**" *Id.*, 59. He further conceded that his failure to engage such an expert was not the result of a tactical or strategic choice. *Id.*, 58.

Mr. Placidi also agreed that an expert would have helped to explain to the jury why Mr. Tate's trial testimony came off as well as it did -- namely that he was on medication that calmed him and treated his psychotic illnesses, such that the jury saw a very different person than the one who the police confronted on the night of the offenses. *Id.*, 59.

### E.    PCRA Post-Hearing Proceedings in the Trial Court

Following submission of post-hearing briefs, the PCRA court issued an order and opinion denying relief on August 12, 2022.

The *Trial Court's Opinion* (*TCO*) found that the claim that trial counsel was ineffective for not presenting a mental health expert, like Dr. Blair, was not of arguable merit. *TCO*, 8. That finding was based in turn on the court's conclusion that "defendant fully presented his defense" without the expert. *Id.*

The *TCO* next found that the course of conduct pursued by trial counsel was reasonable designed to effectuate his interest. Again, this was based on the PCRA

court's conclusion that counsel accomplished what he set out to do – namely present a suicide by cop defense. *Id.*, 8.

The court also found no prejudice. *Id.*, 8-9. It concluded that the expert could not have opined about Petitioner's intent; that the evidence against suicide by cop was "overwhelming" because there were four witnesses who testified that Petitioner shot at the police; and that Petitioner testified about the same issue as the expert witness.

In a final statement, the PCRA court, in effect, found trial counsel's confession of error to be not credible:

> The Court further notes that defense counsel testified at the hearing that he should have called an expert witness. The Court knows Mr. Placidi to be an excellent defense attorney, and has no doubt that he is now second-guessing himself after an unfavorable verdict. However, defense counsel had a very good strategy, which he explained at the beginning of his case and executed during the trial. This strategy, as Mr. Placidi recognized at trial, did not require an expert. "Monday morning quarterbacking" is unfortunately an exercise most attorneys perform after an unfavorable verdict. It does not mean, however, that Mr. Placidi was constitutionally ineffective.

*TCO*, 9-10.[20]

**F.    PCRA Appeal**

An appeal of the PCRA court's denial was perfected and denied. *Commonwealth v. Tate*, 958 WDA 2022 (Pa.Super. Sept. 28, 2023).

---

[20] The PCRA Court's September 14, 2022 one-page *Memorandum Opinion* issued on adds nothing to the *TCO*.

The Superior Court failed to address the third or fourth referral question addressed by Dr. Blair. As to the second referral question, the court found that counsel was not deficient because this was not an instance in which trial counsel engaged in a "wholesale failure" to investigate and present the available mental health defense. *Tate*, 958 WDA 2022 at *slip op.*, 6.

The court also found no prejudice:

> To find prejudice here, the PCRA court would have had to find a reasonable probability that expert testimony would have bolstered Appellant's defense to the extent that the jury would have disbelieved four eyewitnesses and instead credited Appellant's self-serving claim that he discharged his firearm harmlessly "into the air."

*Tate*, 958 WDA 2022 at *slip op.*, 8.

On October 30, 2023, Petitioner filed a timely petition for leave to appeal to the Pennsylvania Supreme Court. *Commonwealth v. Tate*, 268 WAL 2023 (Pa.). The Petition is pending.

## Ground for Relief

**Trial Counsel was Ineffective Under the Sixth and Fourteenth Amendments for Failing to Engage a Mental Health Expert to Support the Trial Defense of Suicide by Cop**

Based upon the above allegations Petitioner was denied the effective assistance of counsel when his trial lawyer failed to engage a mental health expert to assist in his defense.

Trial counsel has acknowledged that he performed deficiently with respect to this failure, and that he had no tactic or strategy for not engaging such an expert. Counsel's deficient performance caused Petitioner prejudice in three respects.

**First**, it resulted in Petitioner's defense of suicide by cop/no intent to kill, unsupported by available and corroborative mental health records. Had the records been presented through a mental health expert, Petitioner's recounting of his history of mental health problems would have found full support. Further, the expert could have assisted the jury in understanding the nature of his illness, his suicide attempts, his medications, and the impact on his state of mind of having gone off his medications at the time of the offense.

**Second**, the expert could have explained to the jury the apparent contradiction between the fact that Petitioner appeared calm, coherent and mentally healthy during the trial and during his testimony, yet his conduct at the time of his offense was largely influenced by his ongoing mental health pathology.

**Third**, the expert could have assisted in sentencing. Petitioner received a sentence that was 5-10 years above the mandatory minimum. Had the expert witness been available to testify or issue a report at sentencing, there is a reasonable probability that Petitioner would have been sentenced to the mandatory minimum of 20-40 years.

The state court's resolution of this ground was contrary to, and was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), and was based on an unreasonable determination of the facts.

### Request for Relief

For all of the above reasons and based on the entire state court record of this matter, Petitioner requests the following relief:

1.      Order that this Petition be served on Respondents;

2.      Require Respondents to respond to the Petition; and,

3.      Grant the Writ of Habeas Corpus.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
215-450-0903
wiseman@wisemanschwartz.com
Counsel for Petitioner,
DeAndre Tate